IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0921

_____

FILED
**November 5, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE L.M.

_____

Appeal from the Circuit Court of Boone County
The Honorable William S. Thompson
Case No. 19-JA-38

VACATED AND REMANDED

_____

Submitted: October 5, 2021
Filed: November 5, 2021

Elliott E. Workman, Esq.
Madison, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Mindy M. Parsley, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent West
Virginia Department of Health
and Human Resources

L. Scott Briscoe, Esq.
Madison, West Virginia
Guardian ad Litem

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.        "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syllabus Point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

WALKER, Justice:

Petitioner M.M. appeals the termination of his parental rights to his child L.M., contending that he was not afforded notice of the proceedings when he was served by publication in a Boone County newspaper.[1] Even though the West Virginia Department of Health and Human Resources (DHHR) argues that Petitioner had family in Boone County and his child resided there, the record is clear that DHHR knew that Petitioner was in North Carolina and not West Virginia. And, by the time DHHR apparently served Petitioner by publication in a North Carolina newspaper, the circuit court had already adjudicated Petitioner.

Applying Rule 21 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, which prohibits adjudication before the answer time frame as set forth in the notice of publication has expired, we conclude that the circuit court erred in adjudicating Petitioner's rights without proper service. Service by publication only in Boone County despite all evidence that Petitioner was in North Carolina was not reasonably calculated to afford Petitioner notice of the proceedings, and so violated his due process rights. The circuit court's order terminating Petitioner's parental rights is thus vacated, and we remand the matter for further proceedings.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

## I.     FACTS AND PROCEDURAL HISTORY

L.M. was in the primary custody of his mother, T.S., when DHHR substantiated a referral and planned to implement an in-home safety plan.  Before that plan could be put in place, however, T.S. died unexpectedly.  DHHR then filed an abuse and neglect petition in March 2019, largely documenting T.S.'s conduct and inability to control her daughter, as well as significant truancy issues, but also seeking to take custody of L.M. and his sister.[2]  The petition alleged that L.M.'s father, Petitioner M.M., had not had contact with L.M. for six months, was $16,911.89 in arrears for child support payments, and had legally abandoned the child as defined by West Virginia Code § 49-1-201 (2018). The circuit court transferred custody to DHHR, and L.M. was placed with his paternal aunt. Between March 2019 and October 2019, the circuit court held various status conferences and received status updates from DHHR.

Then, on October 29, 2019, DHHR filed an amended petition reiterating that Petitioner had abandoned L.M.  In a status summary filed on December 2, 2019, DHHR acknowledged that there was no service on Petitioner.  A copy of the original petition had been sent by certified mail to Petitioner's last known address in Wilmington, North Carolina, but was returned as "Attempted/Unknown."  On December 6, 2019, the circuit court issued an order of publication, permitting DHHR to serve the amended complaint on Petitioner by publication pursuant to West Virginia Code § 49-4-

---

[2] L.M.'s half-sister is not at issue in this appeal.

$601(e)(4)(2019)^3$, and that order was forwarded to the Charleston Gazette to be published for two consecutive weeks. The order of publication did not give an answer period, but listed the adjudicatory hearing date of January 6, 2020; notified Petitioner of a right to counsel; provided information to obtain a copy of the petition; and indicated that Petitioner's parental rights may be terminated upon final disposition.

On January 7, 2020, the circuit court received a status report that the prosecutor's office was checking on proof of publication for Petitioner. On January 27, 2020, the status summary indicated that there was still no proof of publication, but that a new, possible address had been obtained through the Bureau of Child Support Enforcement (BCSE). That address was also in Wilmington, North Carolina. Likewise, the North Carolina Department of Public Safety Website listed Petitioner as being on probation/parole in North Carolina. A copy of the petition was sent by certified mail to the new Wilmington address on February 4, 2020, but as of February 7, 2020 there was no proof of service return. DHHR contacted the North Carolina Department of Public Safety to obtain an address but apparently was told that information could not be divulged.

---

[3] The original petition was filed in March 2019. West Virginia Code § 49-4-604(e) was amended, effective May 20, 2019. The subsection on notice by publication at issue in this opinion was only altered to reflect a numerical reference to the publication statute. The remaining provisions applicable to this opinion have not been meaningfully altered because Petitioner is a parent and the changes contemplate service and notice for non-parent parties. Though there is no substantive difference for our purposes, we refer to the 2019 statute because the service by publication at issue was attempted was post-amendment.

A status summary filed on March 13, 2020, in anticipation of the adjudicatory hearing to be held on March 16, 2020, states that a publication order was published in the Coal Valley News and ran on February 26, 2020, and March 4, 2020.[4] The status summary reflects some reservations on behalf of the CPS worker that the service by publication in Boone County alone was sufficient: "CPSW Belcher emailed [Assistant Prosecuting Attorney (APA)] Anderson to see if the publishing would suffice due to [Petitioner] residing in North Carolina. Worker did explain . . . that [Petitioner] does have family in Boone County as that is who the child [L.M.] resides [with]. APA Anderson to check into worker's inquiry and respond."

During the adjudicatory hearing held on March 16, 2020, DHHR represented to the circuit court that service had been achieved through publication in the Coal Valley News, noting that there was proof of publication. Despite those assertions, no proof of publication in the Coal Valley News is contained in the appendix record or on the docket sheet. DHHR called only one witness, CPS Worker Brandi Belcher. Ms. Belcher testified that Petitioner had not been to any of the hearings; had not contacted her; and as of the time of filing the amended petition, had not paid any child support since 2016.

---

[4] The docket sheet lists another publication order issued on February 20, 2020, but that publication order is not contained in the appellate record and we will not speculate on its contents – or indeed, whether it was intended to be published by the Charleston Gazette or the Coal Valley News. *See* text infra.

Petitioner's court-appointed attorney then focused her cross-examination of Ms. Belcher on the efforts to find and serve Petitioner. During questioning, it was established that DHHR had found Petitioner on North Carolina's offender search website and concluded he had been in jail and was on probation there. Ms. Belcher also testified that she took no further steps, such as speaking to the prosecutor or seeking a court order to obtain Petitioner's address from authorities in North Carolina.

In arguing that service was not made on Petitioner and that he would have had no notice of the proceeding, Petitioner's counsel argued that all of the information available pointed to Petitioner residing in North Carolina. In response, DHHR stated that publication was made in Boone County, where the child lives, and that there was no way to know which North Carolina newspaper was the appropriate one for publication. Finally, DHHR argued that "[Petitioner] has some burden of responsibility of stepping up and taking care of his child . . . [i]t is more than just the fact that he may or may not have known about these proceedings. He has not been involved in the child's life at all." The circuit court found that because the child had resided in Boone County, publication in the Coal Valley News was sufficient for purposes of service and notice and entered its adjudicatory order to that effect.

The circuit court then entered an amended adjudicatory order on June 10, 2020. The amended adjudicatory order states that "[DHHR] reports that the Adult Respondent[] [M.M.] has been served via publication in the Wilmington Newspaper and

the proof of the publication is in the file." The order then concludes that the Wilmington newspaper publication was sufficient notice of the hearing and reiterates its prior findings without holding a new adjudicatory hearing. Notably, there is neither a new order of publication for the Wilmington newspaper nor any proof of publication in the appendix record or on the docket sheet.

On June 24, 2020, the circuit court proceeded to disposition and terminated Petitioner's parental rights to L.M., but the order was not entered at that time.[5] In September 2020, the circuit court held a status hearing, during which Petitioner's counsel stated to the circuit court that Petitioner had contacted her out of the blue, contending that he had been incarcerated in North Carolina and knew nothing about the proceedings. Petitioner appeared with counsel and stated that though he lived out of state, he talked on the phone frequently with L.M., and had messages to prove his relationship with him if the circuit court would reopen the case to allow him to present his evidence. The circuit court denied Petitioner's motion to reopen the case and reaffirmed its prior ruling

---

[5] There is some confusion in the September status hearing transcript as to whether the order terminating parental rights had been entered after the June hearing. From the record, it appears that Petitioner's rights were terminated during the June hearing and reduced to an order that was not signed. As the order had not yet been entered, the circuit court concluded that Petitioner's timeframe for appeal had not yet begun.

terminating Petitioner's parental rights. That ruling was reduced to the order entered October 7, 2020 that Petitioner challenges on appeal.[6]

## II.    STANDARD OF REVIEW

Petitioner's appeal raises both a lack of notice of the proceedings and failure to employ a less-restrictive alternative to the termination of his parental rights. In reviewing those alleged errors, the following standard guides our review:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[7]

---

[6] The order makes findings that Petitioner "has habitually abused and [is] addicted to controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and that [Petitioner] has not responded to or followed through the recommended and appropriate treatment which could have improved the capacity for adequate parental functioning." Allegations of Petitioner's drug use were not made in either the original or amended petitions nor do they appear elsewhere in the record.

[7] Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

## III.    ANALYSIS

West Virginia Code § 49-4-601(e) relates to notice of abuse and neglect proceedings and states that "[t]he petition and notice of the hearing shall be served upon both parents and any other guardian, custodian, or person standing *in loco parentis*, giving to those persons at least five days' actual notice of a preliminary hearing and at least ten days' notice of any other hearing."  It also provides that if personal service within West Virginia cannot be obtained, the petition and the notice of hearing must be mailed by certified mail to the last known address.[8]  "If service cannot be obatined by personal service or by certified mail, notice shall be by publication as a Class II legal advertisement in compliance with § 59-3-1 *et seq.* of this code."[9]  Rule 21 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides for a similar service-by-publication structure where a child is under the protection of the court and no parent or custodian has been found within the State:

> When a child is found in this state and is under the protection of the court and no parent or custodian has been found within this jurisdiction, the court may order service of the notice by publication and proceed with the proceeding.  No adjudicatory hearing may be held until the time for answer [as] set forth in the order of publication shall have expired.  Such a proceeding shall be effective against the interests to parents and custodians to the extent permissible under general law.

---

[8] W. Va. Code § 49-4-604(e)(3).

[9] W. Va. Code § 49-4-604(e)(4).

In examining the publications made here to accomplish service, we are left with more questions than answers. The order of publication listed in the docket sheet and the only order of publication included in the appendix record was intended for publication in the Charleston Gazette, but apparently was never published. Another order of publication apparently issued on February 20, 2020, but as that order of publication is not contained in the appendix record, we have no way of knowing what it said or to whom it was forwarded. From the assertions made in the status summary report and to the circuit court, we can guess that it was forwarded to the Coal Valley News and that a legal advertisement was scheduled to run on February 26, 2020, and March 4, 2020. But we cannot be certain – no proof of publication is listed on the docket sheet or in the record on appeal as required by Rule 4(i) of the West Virginia Rules of Civil Procedure.[10]

Despite the circuit court's finding that service was made on Petitioner through publication in the Coal Valley News, DHHR still felt it necessary to publish notice in Wilmington, North Carolina. Though there are assertions in the record that DHHR "reports" that Petitioner was served via publication in the Wilmington newspaper,

---

[10] Rule 4(i) of the West Virginia Rules of Civil Procedure provides:

> [t]he person serving the process or order or publishing a notice or order shall make proof of service of publication to the court promptly and in any event within the time during which the person served must respond to the process, notice, or order. . . . Failure to make proof of service or publication within the time required does not affect the validity of the service of the process, notice, or order.

there is no order of publication and, again, no proof of publication. So, we are left unable to ascertain if or when Petitioner was served by publication in the Wilmington newspaper or Petitioner's timeframe to respond to that notice. In any case, it is undisputed that the circuit court did not reopen adjudication after the Wilmington notice was purportedly published; it simply issued an amended adjudication order stating that service had been accomplished through publication in the Wilmington newspaper.

In relation to service and adjudication, we recently explained that failure to serve is fatal if the circuit court proceeds to adjudication:

> Service on Petitioner was no minor detail. Without proper service, the circuit court lacked jurisdiction to adjudicate his rights. *Overfield v. Collins*, 199 W. Va. 27, 34 n.5, 483 S.E.2d 27, 34 n.5 (1996) ("Our case law is clear: a court that enters a judgment where there has been insufficient service of process is without jurisdiction to enter said judgment[.]"). Proceeding without service also violated Petitioner's due process right to "a fair decision-making process, including the right to receive written notice of the attempt to affect [his] liberty interest [in his children], the right to present evidence, and the right to obtain a decision from a neutral, detached person or tribunal." *Id.* at 34, 483 S.E.2d at 34. Although Petitioner was eventually served, it was plain error for the circuit court to begin the adjudicatory hearing and make any findings on the record prior to service being properly established.[11]

---

[11] *In re S.J.*, No. 19-0702, 2020 WL 3172863 (W. Va. June 15, 2020) (memorandum decision).

10

Rule 21 of the Rules of Procedure for Child Abuse and Neglect Proceedings similarly provides, in relevant part, that "[n]o adjudicatory hearing may be held until the time for answer [as] set forth in the order of publication shall have expired."

The import of these authorities is clear: if, as DHHR contends, publication in Boone County in the Coal Valley News was sufficient to establish service and notice, there is no reversible error.[12] But if service was not properly made on Petitioner until the publication in the Wilmington newspaper, then the circuit court exceeded its authority when it held the initial adjudicatory hearing on March 6, 2020, so that the court's failure to hold another adjudicatory hearing at the expiration of Petitioner's time frame to respond to the Wilmington notice was error. We therefore turn our attention to the rules surrounding service by publication in this context.

As noted in West Virginia Code § 49-4-604(e)(4), service by publication must be made as a Class II legal advertisement under the provisions of West Virginia Code §§ 59-3-1 through -9. Under West Virginia Code § 59-3-2 (2002), a Class II legal advertisement must be published once a week for two successive weeks in a qualified newspaper published in the publication area. "Qualified newspaper" is defined in West Virginia Code § 59-3-1(b) (2002), in relevant part, as "only a newspaper or newspapers,

---

[12] Though we find the lack of evidence of publication in the Coal Valley News troubling, we are mindful that Rule 4(i) of the Rules of Civil Procedure permits untimely filing of proof of publication without affecting the validity of service, and that Petitioner has not alleged that no publication was made in the Coal Valley News.

11

as the case may be, published (unless otherwise expressly provided) in the State of West Virginia" and which is "of regular issue and . . . ha[s] a bona fide general circulation in the publication area." "Publication area" is defined at § 59-3-1(a)(2) as "the area or areas for which a legal advertisement is required by law or court to be made."

DHHR uses the definition of "qualified newspaper" as limited to publications in West Virginia to bolster its position that publication in Boone County was sufficient as there is no "qualified newspaper" in North Carolina.[13] While it is true that qualified newspapers, unless otherwise provided, means newspapers published in West Virginia, that definition may not be read in a vacuum. DHHR's argument ignores that to meet the definition of "qualified newspaper" in § 59-3-1(b), the newspaper must also be in circulation in the publication area. The definition of "publication area" is not confined to the borders of this state, but where "law or court" demands that it be made. We find

---

[13] Though DHHR does not cite it, given the similarities between the brief submitted by DHHR and this Court's analysis in *In re A.L.*, No. 19-0646, 2020 WL 1674037 (W. Va. April 6, 2020) (memorandum decision), we can guess that this argument is derived from footnote 3 of that decision. But, in *In re A.L.*, DHHR had no contact information whatsoever to locate petitioner and so published in the county where the proceedings were pending. Given those facts, we found no error. And, in that case, petitioner took issue with notice by publication, generally, and did not argue that the publication, while available as a service option, did not comport with the notice provisions as Petitioner argues here. Consequently, *In re A.L.* is of little value to our analysis in this case.

this latter definition of more import in examining the outer bounds of due process in the context of constitutional rights.[14]

In examining what "law or court" requires for service by publication in this context, we are mindful that West Virginia Code § 49-4-604(e)(4) is silent on what it deems the "publication area." We thus look elsewhere, and find the provisions of the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA)[15] instructive. In relation to out-of-state respondents, this Court has held that

> [i]f a circuit court in this State acquires jurisdiction to award custody of a child under the Uniform Child Custody Jurisdiction [Enforcement] Act, [West Virginia Code § 48-20-101 et seq.] it may make such custody determination notwithstanding the fact that personal jurisdiction was not acquired over a parent who is absent from the State, and such adjudication does not violate the absent party's due process rights if the notice provisions of the Act have been complied with.[16]

---

[14] It is worth noting that despite including this proviso that a "qualified newspaper" must be in circulation in the publication area, West Virginia Code § 59-3-2(a) contemplates that there may not be qualified newspapers in the publication area. Further inconsistency arises when examining West Virginia Code § 49-4-114(c)(2) (2015). That code provision also requires that publication be made under the provisions of § 59-3-1 (i.e., in a "qualified newspaper" in the "publication area") but refers specifically to nonresidents and denotes the publication area as the county where the proceedings are pending *and in the county where the nonresident is last known to reside*. Under the reading of West Virginia Code § 59-3-1, et seq. advocated for by DHHR, a party could never serve a notice by publication to a non-resident in the last known residence as that newspaper would necessarily be outside the State of West Virginia – and thus, not a "qualified newspaper."

[15] W. Va. Code §§ 48-20-101 to -404

[16] Syl. Pt. 1, *McAtee v. McAtee*, 174 W. Va. 129, 323 S.E.2d 611 (1984).

13

The notice provision for out-of-state persons under the UCCJEA is found at West Virginia Code § 48-20-108 (2001) and provides in part at subsection (a),

> [n]otice required for the exercise of jurisdiction when a person is outside this state may be given in a manner prescribed by the law of this state for service of process or by the law of the state in which the service is made. Notice must be given in a manner reasonably calculated to give actual notice but may be by publication if other means are not effective.

The proviso in the UCCJEA that notice be "reasonably calculated" is no doubt derived from the term as a widely recognized tenet of due process applied both in this Court and in courts around the country.[17] "Reasonably calculated" notice has been oft-repeated in jurisprudence since the Supreme Court of the United States articulated that standard as a cornerstone of due process in *Mullane v. Central Hanover Bank*.[18] Importantly, though publication is a constructive means of notice, we do not check the "reasonably calculated" standard at the door once a court authorizes a party to serve by publication.[19]

Specifically, the *Mullane* court concluded that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded

---

[17] *See, e.g.*, *Hartwell v. Marquez*, 201 W. Va. 433, 498 S.E.2d 1 (1997); *Vanscoy v. Neal*, 174 W. Va. 53, 322 S.E.2d 37 (1984); *State ex rel. Thomas v. Neal*, 171 W. Va. 412, 299 S.E.2d 23 (1982); *Matter of Adoption of Daft*, 159 W. Va. 895, 230 S.E.2d 475 (1976).

[18] 339 U.S. 306 (1950).

[19] *See* Syl. Pt. 1, in part, *Matter of Adoption of Daft* ("the Constitutional requirement of notice was satisfied where actual notice was impossible and *constructive notice, reasonably calculated, under all the circumstances*, to apprise interested parties of the pendency of the action was given.") (emphasis added).

14

finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[20] *Mullane* further explained that

> [t]he notice must be of such nature as reasonably to convey the required information, . . . and it must afford a reasonable time for those interested to make their appearance[.] . . . But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied.[21]

So, while West Virginia Code § 49-4-604(e)(4) certainly permits service by publication, the lynchpin of this appeal is whether the notice given in the Coal Valley News was reasonably calculated to apprise Petitioner of the proceedings given all of the attendant circumstances. In answering this question under the facts of this case, *Mullane* again proves useful: "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."[22]

In applying those principles here, we cannot conclude that DHHR exercised due diligence and that Petitioner's whereabouts were "unknown" such that publication in Boone County was sufficient when DHHR had actual knowledge that he was not at all

---

[20] *Mullane*, 339 U.S. at 314.

[21] *Id.* at 314-15 (internal citations omitted).

[22] *Id.* at 315.

likely to receive notice there.[23]  At the time of filing its original petition, DHHR knew Petitioner's last known address was in Wilmington, North Carolina.  It then obtained a second address, also in Wilmington, North Carolina.  It observed on the North Carolina offender search that Petitioner was on parole or on probation in North Carolina, then took no steps to seek a court order or to have the prosecutor attempt to contact North Carolina's authorities to obtain information as to his whereabouts.[24]  All of the evidence available pointed DHHR to North Carolina, and even the CPS worker expressed concern that publication in Boone County was insufficient given that DHHR knew Petitioner was in North Carolina.

The reason proffered by DHHR to justify publication only in Boone County was that Petitioner had family there and that his child was there.  We look askance at that argument given that those same relatives not only reported that they had had no contact

---

[23] We do not find DHHR exercised due diligence in attempting to locate Petitioner, to the extent that it may have been premature to resort to notice by publication without attempting to get a court order to contact North Carolina authorities first to obtain a viable address for Petitioner.  But, while there is nothing in the record detailing what efforts DHHR proffered to the circuit court, the circuit court did issue an order of publication, and Petitioner does not appear to challenge that DHHR was permitted to serve him by publication. For that reason, we focus less on DHHR's efforts to provide notice through certified mail by making diligent efforts to obtain Petitioner's actual address and more on whether the constructive service needed to be published in North Carolina.

[24] Petitioner contends that he was incarcerated during the entire pendency of the proceedings, but there is no evidence in the record to confirm that he was incarcerated as opposed to on probation or parole.  We therefore concentrate on what DHHR knew or believed and what steps it took in light of that information.

with Petitioner, but were also the ones seeking to adopt the child once Petitioner's rights could be terminated. And, while the child's presence in Boone County is sufficient for subject-matter jurisdictional purposes, DHHR's argument ignores that there is also a due-process-derived "reasonably calculated notice" requirement aimed at the *parent* who may be a nonresident. DHHR's argument in this regard insinuates that Petitioner's lack of notice that there were ongoing proceedings in Boone County is simply more evidence of Petitioner's abandonment. But, while Petitioner's residence in another state may be used as evidence in the proceedings, DHHR's argument misses the mark by failing to recognize that giving Petitioner notice of the proceedings to *defend* those charges, if he has any defense, is the core objective.

In 1950, the *Mullane* court recognized that the odds of providing actual notice by publishing in a newspaper were abominably slim,[25] and it is truer today in the age of declining print media. In the interest of fair play, we make no bones about the fact that service by publication is decidedly unlikely to reach its target audience, and so is already the least calculated of all manners of service to apprise a parent that his or her parental rights – *constitutional rights* – are in jeopardy.

Yet even where the stakes are of constitutional proportion, we recognize that these proceedings *must* go forward, and that in cases of absentee parents, the necessity of service by publication is an unfortunate reality. In many circumstances of

---

[25] *Id.* at 315.

17

absenteeism, service by publication may comport with due process by publication only in the county where the proceedings are pending. But where, as here, DHHR has affirmative evidence that the intended recipient does not reside in the county where the action is pending and is even *more* unlikely to be apprised of the proceedings by publication only in that area, we find that due process demands more.

In rendering this decision, it is not our goal to make a bright-line rule; "reasonably calculated" is not amenable to one.[26] One might defend the reasonableness of publishing notice only in the county where the proceedings are pending on the basis that it is just as likely to reach the respondent there as anywhere else – as in the case of a person whose whereabouts are legitimately unknown, or that the facts and circumstances suggest some presence, transient or otherwise, in the county where the proceedings are pending that would render publication there utterly reasonable despite a "residence" elsewhere. However, publication only in Boone County in the Coal Valley News under these facts and circumstances so diminishes the likelihood of notice to Petitioner that it is

---

[26] We divert to a reasonableness analysis here because the statute, West Virginia Code § 49-4-604(e), does not specify the "publication area" in the context of abuse and neglect proceedings initiated under that provision. But, in a very similar context, there is a bright-line rule. West Virginia Code § 49-4-114(c)(2) requires that in the context of petitions filed to terminate parental rights for *adoption* purposes where the serving party must resort to notice by publication, the "publication area shall be the county where the proceedings are had, and in the county where the person to be served was last known to reside." Such notice is afforded to both non-residents and those whose whereabouts are unknown. *Id.* We invite the Legislature to examine whether similar notice protections should be afforded in proceedings initiated upon the same grounds for termination of parental rights under a different code provision.

18

no notice at all – it was so hollow a gesture of due process that it was seemingly intended *not* to reach him.

On these facts, we thus cannot conclude that Petitioner was afforded notice of the proceedings until he was served by publication in the Wilmington newspaper. Though we have no indication from DHHR as to when that publication was made, either by statement in open court, status summary, or proof of publication, we do know that it occurred, if it occurred at all, after the adjudicatory hearing and that the circuit court did not reopen adjudication after publication in the Wilmington newspaper. For that reason, we must vacate the circuit court's order, as Rule 21 of the Rules of Procedure for Child Abuse and Neglect Proceedings prohibits adjudication before the time frame to respond to the publication has expired, and this Court's precedent requires that before adjudication of parental rights, that parent be afforded notice that comports with due process standards. We remand for further proceedings consistent with this opinion.

## IV. CONCLUSION

For the reasons set forth above, the October 7, 2020 order of the Circuit Court of Boone County terminating Petitioner's parental rights is vacated and we remand this matter for further proceedings.

Vacated and remanded.

19